USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: July 31, 2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                           :

TRUSTEES OF THE NEW YORK CITY     :
DISTRICT COUNCIL OF CARPENTERS   :
PENSION FUND, WELFARE FUND,      :
ANNUITY FUND, and APPRENTICESHIP, :
JOURNEYMAN RETRAINING,        :
EDUCATIONAL AND INDUSTRY FUND,  :
TRUSTEES OF THE NEW YORK CITY    :
CARPENTERS RELIEF AND CHARITY FUND,:
THE NEW YORK CITY AND VICINITY   :     16 Civ. 4719 (KPF)
CARPENTERS LABOR-MANAGEMENT    :
CORPORATION, and THE NEW YORK CITY :    OPINION AND ORDER
DISTRICT COUNCIL OF CARPENTERS,   :
                           :
               Petitioners, :
                           :
           v.               :
                           :
PORT PARTIES, LTD.,           :
                           :
              Respondent. :
                           :
------------------------------------------------------X

KATHERINE POLK FAILLA, District Judge:

      This Opinion considers two very different narratives about a single labor

arbitration. Petitioners New York City District Council of Carpenters (the

"Union") and several associated benefit funds (the "Funds," and together with

the Union, "Petitioners")[1] seek to enforce a March 24, 2016 arbitration award

(the "Default Award") against Respondent Port Parties, Ltd. ("Port Parties"). By

---

[1]    Like Petitioners, the Court will use the term "Funds" to refer collectively to (i) the New
York City District Council of Carpenters Pension Fund, Welfare Fund, Annuity Fund,
and Apprenticeship, Journeyman Retraining, Educational and Industry Fund; (ii) the
New York City Carpenters Relief and Charity Fund; (iii) those funds' Trustees; and
(iv) the New York City and Vicinity Carpenters Labor-Management Corporation.

Petitioners' account, this should be a straightforward proceeding.  Port Parties's collective bargaining agreement with the Union (the "CBA") required Port Parties to make periodic contributions to the Funds.  When Port Parties failed to do so, the Funds demanded that Port Parties submit to arbitration.  And when Port Parties did not attend the parties' arbitration hearing (the "Arbitration Hearing"), Arbitrator Roger Maher entered the Default Award in the Funds' favor.  Petitioners now seek to confirm the Default Award under § 301 of the Taft-Hartley Labor Management Relations Act of 1947, 29 U.S.C. § 185 (the "LMRA"), and to recover the attorney's fees and costs they have incurred in litigating this action.

Port Parties, in contrast, urges the Court to vacate the Default Award.  Port Parties concedes that it did not attend the Arbitration Hearing — but only because Petitioners agreed to adjourn it.  Despite that agreement, Port Parties claims, Petitioners went to the Arbitration Hearing and failed to tell Arbitrator Maher that Port Parties would not be joining.  As a result of Petitioners' subterfuge, Port Parties was unable to identify for Arbitrator Maher the flaws in Petitioners' damages calculations.  Thus, Port Parties contends, the Default Award is both fundamentally flawed and the product of Petitioners' fraud.

At bottom, Port Parties's account of this case is based on a series of misunderstandings.  There was no subterfuge here:  Petitioners never agreed to adjourn the Arbitration Hearing, because Port Parties never requested an adjournment of it.  And because Port Parties's other attacks on the Default Award are unavailing, it falls short of the high bar the LMRA imposes on a

party seeking to vacate a labor arbitration award. Thus, the Court grants Petitioners' petition to confirm the Default Award, denies Port Parties's cross-petition to vacate it, and grants Petitioners' application for fees and costs.

## BACKGROUND[2]

The crux of this case is a fact-intensive question: Why did Port Parties think that the Arbitration Hearing had been adjourned? A key to answering this question is that the Arbitration Hearing was one of three similar arbitration proceedings that occurred in 2016. There was one arbitration between Port Parties and the Union; this arbitration was adjourned at Port Parties's request. There was another arbitration between the Funds and Showtime on the Piers LLC ("Showtime"), an entity that shares an address and an owner, Charles Newman, with Port Parties. This second arbitration resulted

---

[2]    This Opinion draws on facts from several sources that the parties have submitted: Petitioners' Local Civil Rule 56.1 Statement ("Pet'r 56.1" (Dkt. #22)) and Port Parties's Counter Rule 56.1 Statement ("Resp't 56.1" (Dkt. #31)); the Declarations of Tony Sgroi ("Sgroi Decl." (Dkt. #25)), Frank Brennan ("Brennan Decl." (Dkt. #28)), James C. Sherwood ("Sherwood Decl." (Dkt. #33)), Luke Powers ("Powers Decl." (Dkt. #36)), Charles R. Virginia ("Virginia Decl." (Dkt. #37)), and Jenny Liang ("Liang Decl." (Dkt. #38)); the Affidavit of Charles Newman ("Newman Aff." (Dkt. #29)); a string of 2016 e-mails concerning the Union's arbitration with Port Parties ("Union Arbitration E-mails" (Dkt. #38-7)); the CBA between Port Parties and the Union ("CBA" (Dkt. #24-1)); and the Default Award Petitioners are seeking to confirm ("Default Award" (Dkt. #24-10)).

Citations to a party's Local Civil Rule 56.1 Statement incorporate by reference the documents cited therein. This Opinion also cites to the exhibits attached to the declarations listed *supra* (e.g., "Brennan Decl., Ex. [ ]").

For ease of reference, the Court refers to Petitioners' opening brief as "Pet'r Br." (Dkt. #23), to Port Parties's brief in support of its cross-motion to vacate as "Resp't Br." (Dkt. #30), and to Petitioners' reply brief as "Pet'r Reply" (Dkt. #35).

Throughout this Opinion, the Court will spell the possessive form of the singular noun "Port Parties" as "Port Parties's." The parties use a different construction in their briefs: "Port Parties.'" (*See, e.g.*, Resp't Br. 1; Pet'r Reply 1). For ease of reading, the Court will not indicate where it has altered statements taken from the parties' submissions in order to match its grammatical preference.

in a default award against Showtime, and Petitioners are currently seeking to confirm that default award in another proceeding in this District. *See* Docket, *Trs. of the N.Y.C. Dist. Council of Carpenters Pension Fund, Welfare Fund, Annuity Fund, & Apprenticeship, Journeyman Retraining, Educational & Industry Fund* v. *Showtime on the Piers, LLC*, No. 16 Civ. 4788 (RA) (S.D.N.Y.). And finally, there was an arbitration between the Funds and Port Parties, which resulted in the Default Award that Petitioners seek to confirm here. An account of the relationships between the parties to these three arbitrations, and of how these arbitrations unfolded, follows.

## A. Factual Background

### 1. The Union, the Funds, Port Parties, and Showtime

"The Union is a labor organization that represents employees in an industry affecting commerce within the meaning of [§] 501 of the LMRA, 29 U.S.C. § 142." (Pet'r 56.1 ¶ 7). The Funds consist of, *inter alia*, retirement and charity funds organized under the Employee Retirement Income Security Act of 1974 ("ERISA") and the Internal Revenue Code, respectively. (*Id.* at ¶¶ 1, 4).

Port Parties ceased operating "in or around December 2014"; it formerly "operat[ed] trade shows and related functions at various locations in Manhattan." (Resp't 56.1 ¶¶ 39, 41). Newman was Port Parties's President. (*Id.* at ¶ 38). Newman is also the President of Showtime, an entity that shares a mailing address with Port Parties. (*Id.* at ¶ 77; Virginia Decl., Ex. 15, at 5).

## 2.      The CBA Between the Union and Port Parties

In 2010, the Union and Port Parties executed the CBA.  (CBA 45).[3]  Port Parties subsequently executed "an [I]nterim [C]ompliance [A]greement … which extended the CBA's terms … through the time period relevant to the underlying arbitration."  (Pet'r 56.1 ¶ 11).

The CBA set conditions for "wages, hours, and working conditions for" Union members performing work for Port Parties.  (*See* CBA Art. I).  Three aspects of the CBA deserve close attention here:  (i) its geographic scope, (ii) its terms concerning Port Parties's obligation to make benefit contributions to the Funds, and (iii) its arbitration provision.

First, by its terms, the CBA "cover[ed] work performed by [Union] employees" across, *inter alia*, "[a]ll of the five [ ] Boroughs of the City of New York."  (CBA Art. VIII, § 1).  Port Parties, however, contends that the CBA's reach was in fact narrower:  Among other things, Port Parties argues that the CBA did *not* cover "work completed at the New York Passenger Ship Terminal." (Resp't 56.1 ¶ 12).  Instead, Port Parties claims, work at this location was governed by a different collective bargaining agreement, one between Port Parties and Local Union No. 1909, International Longshoreman's Association,

---

[3]      The CBA's cover page provides that it governed the labor relationship between the Union and Port Parties from July 1, 2001, through June 30, 2006.  (CBA Cover).  But per the CBA's signature page, the Union and Port Parties executed the CBA several years later.  (*Id.* at 45).  This ambiguity over dates is not material; the parties agree that the CBA's terms were in effect "through the time period relevant to the underlying arbitration" in this case.  (Resp't 56.1 ¶ 11).

AFL-CIO (the "Longshoreman's Union"). (*Id.* at ¶ 30; *see* Brennan Decl., Ex. D, at 1).

Second, the CBA obligated Port Parties to "make contributions" to the Funds "for each hour worked of all employees covered by [the CBA] and employed by [Port Parties] within the territory" the CBA covered. (CBA Art. VX, § 1). To ensure that Port Parties complied with this obligation, the CBA required Port Parties "to furnish its books and payroll records for an audit" "upon demand of the" Funds. (Pet'r 56.1 ¶ 13; CBA Art. XV, § 2).

Finally, the CBA contained a broad arbitration clause. The CBA required Port Parties and the Union to "first attempt to settle and adjust" any "complaints, disputes, [or] differences" arising under the CBA, except for "the merits of [a] jurisdictional dispute, i.e., a dispute with another trade over the assignment of work." (CBA Art. XII, § 1). "Any grievance not resolved" was required to "be submitted to arbitration before" one of three arbitrators, including Arbitrator Maher. (*Id.* at § 2). The CBA further manifested "the intent of" Port Parties and the Union "that all disputes between them, both within and outside of the [CBA], [would] be submitted to arbitration." (*Id.* at § 3). And the CBA contained an important proviso about the logistics of initiating such an arbitration:

> Service of any documents or notice referred to [in the CBA's Article concerning arbitration], or service of any notice required by law in connection with arbitration proceedings may be made by registered or certified mail. A post office receipt shall be conclusive evidence of proper service if mailed to the address designated by [Port Parties] when it signed the [CBA]. If certified or registered mail is refused or not picked up ordinary mail

6

shall be deemed sufficient service provided that it is forwarded to the address of record contained in [the CBA].

(*Id.*). The CBA also provided that if either party to the CBA successfully confirmed an arbitration award, that party would be "entitled to receive all court costs in [that] proceeding as well as reasonable attorney's fees." (*Id.*).

### 3. The Audit and the Funds' Arbitration Demand

"Pursuant to the CBA ..., the Funds conducted an audit of [Port Parties's] books and payroll records." (Pet'r 56.1 ¶ 19). The record does not disclose clearly the date on which the audit concluded, but it is undisputed that the audit reviewed Port Parties's contributions to the Funds for the time period between March 17, 2010, and December 31, 2014. (*See* Resp't 56.1 ¶ 23).

This audit — which Petitioners claim resulted in a finding that Port Parties under-contributed to the Funds throughout the audit period — was the subject of a prior lawsuit between Petitioners, Port Parties, and Showtime. (Newman Aff. ¶ 3); *see* Docket, *Trs. of the N.Y.C. Dist. Council of Carpenters Pension Fund, Welfare Fund, Annuity Fund, & Apprenticeship, Journeyman Retraining, Educational & Industry Fund* v. *Port Parties, Ltd.*, No. 15 Civ. 5408 (KBF) (S.D.N.Y.). On October 13, 2015, Petitioners, Port Parties, and Showtime executed a Tolling Agreement, pursuant to which Petitioners agreed to discontinue this earlier federal action in exchange for Newman opening Port Parties's and Showtime's books "to allow for the audit process to be completed." (Brennan Decl., Ex. F, ¶¶ 1-6). The parties to the Tolling Agreement further agreed to toll the statute of limitations for any claim the Funds might have

against Port Parties and Showtime "for recovery of delinquent fringe benefit contributions." (*Id.* at ¶ 8).

Once it was fully completed, Petitioners' audit revealed that Port Parties had "failed to remit contributions" to the Funds "in the principal amount of $463,041.48." (Pet'r 56.1 ¶ 23). All told, Petitioners concluded that Port Parties owed them $647,387.03, a figure that included, *inter alia*, interest and liquidated damages. (Sgroi Decl. ¶ 12). Port Parties retorts that this figure "is erroneous and inflated" for three reasons: (i) it "includes work completed by employees for which the [ ] Union was not the appropriate bargaining unit"; (ii) "the audit ... failed to credit [Port Parties] with $138,169.10[ ] in applied funds that are being held by the Funds"; and (iii) the audit "erroneously included hours for supervisors who are not covered by the CBA." (Resp't 56.1 ¶ 23).

With the audit results in hand, the Funds commenced an arbitration against Port Parties. (Pet'r 56.1 ¶ 32). On January 28, 2016, the Funds sent, by regular and certified mail, a Notice of Intention to Arbitrate to Arbitrator Maher and Port Parties. (Brennan Decl., Ex. B). The caption of that notice identified Petitioners (i.e., the Funds *and* the Union) as the parties seeking an arbitration against Port Parties. (*Id.* at 2). But the letter enclosing the notice made plain that "the Funds" had initiated the arbitration in order to resolve "the dispute between [Port Parties] and the Funds regarding the outstanding audit deficiency." (*Id.* at 1). And the Notice of Intention to Arbitrate stated that the "controversy" to be arbitrated was: "Delinquent fringe benefit contributions

8

due to the Funds for the period: 03/17/2010 [to] 12/31/2014 in the amount of $650,395.23." (*Id.* at 3).

The certified mail receipt for the Notice of Intention to Arbitrate that the Funds sent to Port Parties indicates that it was delivered on February 1, 2016, and signed for by "Security." (Brennan Decl., Ex. B, at 4-5). The address to which the Funds mailed the notice — 711 12th Avenue, New York, New York 10019 — is listed as Port Parties's address on the CBA, the Interim Compliance Agreement that extended the CBA, and the New York Department of State's website. (CBA 1; Davidian Decl., Ex. 2, at 2; Virginia Decl., Ex. 14).

Port Parties, however, claims that it "never received the purported Notice of Intent[ion] to Arbitrate from Petitioners." (Resp't 56.1 ¶ 54). Port Parties explains that it "has never employed any of the security guards stationed at the New York Passenger Ship Terminal," which the Court infers is located at 711 12th Avenue. (*Id.* at ¶ 57). These security guards "are not agents of Port Parties and are not authorized to accept service of process or legal documents on behalf of Port Parties." (*Id.* at ¶ 58).

On January 31, 2016, Arbitrator Maher issued a Notice of Hearing scheduling the arbitration between the Funds and Port Parties. (Virginia Decl., Ex. 15, at 4). The Notice of Hearing set the arbitration for March 23, 2016, at 11:30 a.m., and identified the "Issue" to be arbitrated as "Fringe Benefits for" the "Delinquency Period" of "3/17/2010 through 12/31/2014," in the total amount of "$650,395.23." (*Id.*). Arbitrator Maher sent the Notice of Hearing to Port Parties by regular and certified mail, to the same 12th Avenue address to

9

which the Funds had mailed their Notice of Intention to Arbitrate. (*Id.* at 1-2). And like the certified mail receipt for the Funds' Notice of Intention to Arbitrate, the receipt for the Notice of Hearing stated that it was signed for by "Security" on February 9, 2016. (*Id.* at 2). Port Parties claims that it never received Arbitrator Maher's Notice of Hearing. (Resp't 56.1 ¶ 56).

Arbitrator Maher mailed another Notice of Hearing on January 31, 2016; this notice scheduled an arbitration between the Funds and Showtime. (Virginia Decl., Ex. 15, at 3). There are few details about this arbitration in the record of this case. But the Notice of Hearing for that arbitration provided that, like the Funds' arbitration with Port Parties, the Funds' arbitration with Showtime concerned delinquent fringe benefit contributions. (*Id.*). Arbitrator Maher scheduled the Funds/Showtime arbitration hearing for March 23, 2016, at 11:00 a.m. — thirty minutes before the Funds' arbitration hearing with Port Parties. (*Id.*).

### 4. Port Parties's Union Arbitration Adjournment Requests

Thus far, the Court has addressed two of the three arbitrations involving the parties to this case and entities related to them. As noted, Arbitrator Maher scheduled one of these arbitrations (between the Funds and Showtime) for March 23, 2016, at 11:00 a.m. And he scheduled another arbitration (between the Funds and Port Parties) for that same day at 11:30 a.m. In this section, the Court addresses the third arbitration — which was between the *Union* and Port Parties — and Port Parties's request to adjourn it.

"Between 2014 and 2015, the [ ] Union received five grievances filed against Port Parties." (Liang Decl. ¶ 4). On January 22, 2016, Paul Tyznar, the Union's Grievance Committee Chair, mailed a "Demand for Arbitration and Notice of Hearing" to Port Parties at the 12th Avenue address. (*Id.*, Ex. 17, at 2-3). That document was printed on Union letterhead, listed the file numbers assigned to each of the five grievances, and stated that the arbitration between the Union and Port Parties concerning those grievances would be held on March 14, 2016, at 11:00 a.m. (*Id.*).

On February 22, 2016, Jenny Liang — a paralegal for the Union — e-mailed Newman at his "Port Parties" and "Showtime" e-mail addresses. (Union Arbitration E-mails 4). Liang wrote: "As a friendly reminder, we have an arbitration hearing scheduled for **March 14, 2016** at **11:00 AM** between the [Union] and Port Parties." (*Id.* (emphasis in original)). The e-mail then listed the file numbers for the five grievances scheduled to be addressed at the arbitration. (*Id.*).

Newman responded to Liang's e-mail on February 26, 2016: "We need to [postpone] these arbitrations as well as any others until we have time to meet and discuss the open issues — we don't want to default on any of these." (Union Arbitration E-mails 2-3). Copied on Newman's e-mail were Tyznar, Scott Danielson, Patrick Kennedy, Jeremy Milin and Matthew Walker — all of whom, Port Parties claims, work for *Petitioners* (not just the Union). (Resp't 56.1 ¶ 61). Thus, Port Parties contends, after receiving Newman's February 26 e-mail, these "representatives of [ ] Petitioners possessed actual and/or

constructive knowledge of [ ] Port Parties's specific and expressed desire to adjourn all respective arbitrations between Port Parties and Petitioners." (Newman Aff. ¶ 39).

Liang replied to Newman's e-mail on February 26, 2016. (Union Arbitration E-mails 2). She wrote: "To request a cancellation or adjournment, please send a request to Arbitrator Maher." (*Id.*). Liang then provided Arbitrator Maher's e-mail address and telephone number. (*Id.*). Newman claims that he "left a voicemail message for Arbitrator Maher" "[s]ometime on or after February 26, 2016" to "request[ ] an adjournment of all pending arbitrations against Port Parties." (Newman Aff. ¶ 41). Newman requested this adjournment because, in January 2016, "federal officers confiscated all of the original records belonging to Port Parties in connection with a multi-agency investigation." (Resp't 56.1 ¶ 50; *see* Newman Aff. ¶ 41). And those records, Port Parties claims, "included … employment related documents that are relevant to and needed for [ ] Port Parties's defense of the claims made by Petitioners." (Resp't ¶ 51).

Arbitrator Maher did not return Newman's voicemail. (Resp't 56.1 ¶ 64). For his part, Arbitrator Maher does not recall receiving a request to adjourn the *Funds'* arbitration with Port Parties, although he does recall receiving "a request for adjournment as to a *Union* [a]rbitration." (Virginia Decl., Ex. 15, at 1 (emphasis added); *see also* Default Award 1-2 (noting that Port Parties made no "request for an adjournment or extension of time to appear" at the Arbitration Hearing)).

Liang sent Newman a follow-up e-mail on March 10, 2016, writing: "Please confirm if your request for an adjournment [of] the arbitration was granted. It is scheduled for Monday, March 14, 2016." (Union Arbitration E-mails 1). Newman responded that same day: "Yes we need one." (*Id.*). In this regard, Port Parties also claims that

> [p]rior to March 14, 2016, [ ] Newman advised several of Petitioners' representatives, including, but not limited to [ ] Liang[;] Luke Powers, Petitioners' Employer Services Director of the NYC District Council of Carpenters ("NYCDCC") Benefits Funds[;] John Catania, auditor for the NYCDCC Benefit Funds[;] and Stephen McInnis, Petitioners' President, that Port Parties required an adjournment of all arbitrations pending against them because they were not in possession of relevant records due to the seizure of such records by government agents.

(Resp't 56.1 ¶ 67). But as Powers explains in a signed declaration, he is the *only* one of the individuals whom Newman allegedly contacted that actually works as a "representative of the Funds," as distinguished from the Union. (Powers Decl. ¶ 12). And Powers also avers that "[a]t no point in time did [he], or anyone else from the Funds, ever consent to any adjournment of the March 23, 2016 arbitration hearings set for both Port Parties and Showtime." (*Id.* at ¶ 13).

Port Parties claims that "[o]n or about March 14, 2016, … Liang orally advised [ ] Newman that Arbitrator Maher had granted [his] adjournment request." (Resp't 56.1 ¶ 68). Three days later, Liang e-mailed Newman to confirm that "[t]he grievances are to be continued for the arbitration date of May 24, 2016." (Union Arbitration E-mails 1). Newman claims that after

13

receiving that e-mail, he "was under the impression that all arbitrations pending against Port Parties had been adjourned until May 24, 2016." (Resp't 56.1 ¶ 70). Liang, however, recalls that her "conversations with [ ] Newman were focused on adjourning the March 14, 2016 hearing concerning the [ ] Union's five grievances against Port Parties." (Liang Decl. ¶ 7). By Liang's account, she and Newman "never discussed adjourning any arbitration hearings brought by the Funds" — indeed, Liang "do[es] not have any authority to act on behalf of the Funds." (*Id.*).

"On or about March 22, 2016" — one day before Port Parties's scheduled arbitration with the Funds — "Newman received a phone call from Petitioners' auditor," who asked Newman "whether he would be attending the arbitration scheduled for March 23, 2016[,] before Arbitrator Maher." (Resp't 56.1 ¶ 71). Newman "was confused": It was his understanding "that all pending arbitrations against Port Parties had been adjourned." (Newman Aff. ¶ 50). In response to the auditor's call, Newman "immediately" called Petitioners' counsel Charles Virginia, as well as Catania, McInnis, and Walker, "to remind them that Port Parties needed an adjournment of the arbitrations scheduled for March 23, 2016." (*Id.* at ¶ 51). Newman claims that Catania and McInnis "assured [him] that securing an adjournment of the arbitrations would not be a problem if a letter was sent to [ ] Virginia setting forth the reason(s) for the adjournment." (*Id.*).

But Newman did not send a letter to Virginia. Instead, on March 22, 2016, he sent "Catania a copy of a letter dated February 17, 2016 ... requesting

the same adjournment in an unrelated matter"; the letter "was prepared by James Sherwood, Esq., who was then Port Parties's attorney in relation to the government investigation that was being conducted." (Newman Aff. ¶ 52). After reviewing this letter, Catania "suggested to [Newman] that a similar letter be sent to ... Virginia[ ] in support of [ ] Port Parties's request to adjourn the arbitrations scheduled for March 23, 2016." (*Id.* at ¶ 53). Catania also told Newman "that [Catania] consulted with his supervisor 'Benedetta[,'] who stated he did not foresee any issue in adjourning the arbitrations scheduled for March 23, 2016." (*Id.*).

Sherwood recalls that on March 22, 2016, Newman explained to him "that he had reached an agreement with representatives of Petitioners to adjourn an arbitration scheduled for the following day." (Sherwood Decl. ¶ 3). Newman asked Sherwood to "send a letter [to] Petitioners' counsel seeking an adjournment of the arbitration." (*Id.*). And at 6:05 p.m. that evening, Sherwood sent an e-mail to Virginia titled: "arbitration vs. Showtime." (Brennan Decl., Ex. M, at 1). Sherwood's e-mail enclosed a letter, which bore a "Re:" line of "Showtime on the Piers, LLC." (*Id.* at 3). The contents of Sherwood's letter were consistent with that "Re:" line:

> I am writing on behalf of Showtime .... I have been informed that employment records of Showtime [ ] are required for an arbitration with the New York District Council Benefits Fund scheduled for March 23, 2016.
>
> [ ] Newman of Showtime has informed me that Showtime does not have the requested records in its possession. On January 21, 2016, original business records of Showtime were taken into possession by

> federal officers. ... Showtime does not have copies of
> the records in government possession.
>
> ... I ask that Showtime be allowed 60 days to obtain
> copies of these records. I will keep you informed of the
> status of my request and will forward these documents
> to you as soon as I receive them.

(*Id.*). The letter makes no reference to Port Parties. (*Id.*).

Virginia did not respond to Sherwood's letter — which "was the first and
only request [he] received from Showtime to adjourn the March 2[3], 2016
arbitration hearing against it" — because he "had already left the office for the
night." (Virginia Decl. ¶ 5). Virginia recalls that he "never received a request
for an adjournment of the March 23, 2016 arbitration hearing from Port Parties
and, as such, [he] never agreed to adjourn Port Parties's arbitration hearing."
(*Id.* at ¶ 6).

### 5.  The March 23, 2016 Arbitration Hearing and the Default Award

On the morning of March 23, 2016, Virginia attended the arbitration
hearing between the Funds and Showtime (which was scheduled to begin at
11:00 a.m.), and the hearing between the Funds and Port Parties (which was
scheduled to begin at 11:30 a.m.). (Virginia Decl. ¶ 7; *id.*, Ex. 15, at 3-4;
Default Award). No representative for Showtime, or for Port Parties, appeared.
(Virginia Decl. ¶ 7).

"During these hearings," Virginia "advised Arbitrator Maher that
Showtime had requested an adjournment the night before via [ ] Sherwood's e[-
]mail." (Virginia Decl. ¶ 7). Then, Virginia called Sherwood. (*Id.*). Sherwood
remembers receiving this call: He recalls that "Virginia may have had [him] on

speakerphone," and that Arbitrator Maher "may have also been on the phone call." (Sherwood Decl. ¶ 5). Virginia asked Sherwood whether he "was appearing as counsel at the arbitration." (*Id.*). Sherwood told Virginia that he was not. (*Id.*; *see also* Virginia Decl. ¶ 7 ("Sherwood stated that he did not represent either Showtime or Port Parties in the arbitrations.")).

The following day — March 24, 2016 — Arbitrator Maher entered the Default Award in the Funds' favor. (Default Award). Arbitrator Maher wrote that during the Arbitration Hearing, Virginia had "submitted proof that [Port Parties] had legally sufficient notice of th[e] proceeding and the claims against [it]." (*Id.* at 1). Arbitrator Maher added that he had "found [Port Parties] to be in default," because Port Parties did not appear at the Arbitration Hearing and had not requested "an adjournment or extension of time to appear." (*Id.* at 1-2). And after reviewing Petitioners' "substantial and credible evidence," including "[t]he testimony of the auditor employed by [ ] Petitioners," Arbitrator Maher concluded that Port Parties had violated the CBA. (*Id.* at 2-3). He ordered Port Parties to pay the Funds $673,994.50 — a figure that included delinquent Funds contributions, interest, damages, costs, and fees — plus 5.25% interest "from the date of" the Default Award. (*Id.* at 3).

### 6.    The Parties' Post-Arbitration Hearing Correspondence

On April 1, 2016, Newman forwarded to Walker and McInnis his February 2016 and March 2016 e-mail correspondence with Liang concerning the Union's arbitration with Port Parties. (Brennan Decl., Ex. N). Newman wrote: "If you scroll down — I advise I need delay all arbitrations on feb 26th —

this is same arbitrator so I assumed it was put off." (*Id.*). Walker responded that same day: "This is for grievances/arbitrations with the [Union] and they were postponed. The arbitration with Chuck Virginia was with the [Funds] and the [Union] has no authority or jurisdiction in that matter." (*Id.*, Ex. O).

In response to Walker's e-mail, Newman wrote that "Petitioners [had] wrongfully diverted trust fund monies paid by Showtime in 2015 as prepayment for fringe benefit contributions on behalf of its own employees and misapplied them toward fringe benefit contributions that were alleged to be due from Port Parties." (Newman Aff. ¶ 69; *see* Brennan Decl., Ex. P). Petitioners explain that Newman was referring to "a longstanding dispute between the parties over whether payments Showtime made towards contributions owed for work it performed on Port Parties's projects can be allocated towards [ ] Port Parties's delinquencies." (Powers Decl. ¶ 15). Petitioners add that this issue has been brewing since July 2015, and that "[s]ubsequent payments" from Showtime "have increased the on account money to approximately $130,000." (*Id.* at ¶ 16; *see* Resp't 56.1 ¶ 98 ("Petitioners are holding an additional $138,169.10 in funds paid by Showtime that have not been allocated.")).

On October 25, 2016, during the briefing schedule for this motion, Port Parties's counsel sent a letter to the Longshoreman's Union on behalf of Port Parties and Showtime. (Virginia Decl., Ex. 16, at 4). The letter explained that the Union was "asserting a claim for the carpentry work at the New York Passenger Ship Terminal and seeking payment of fringe benefit contributions to the [Funds] in connection with such work." (*Id.*). And the letter warned the

Longshoreman's Union that if it did not respond to the letter by 5:00 p.m. the following day, the Longshoreman's Union "[would] be deemed to have waived any jurisdictional claim over said carpentry work." (*Id.* at 5).  The Longshoreman's Union responded by e-mail and fax on October 25, writing that its position was "that carpentry work performed at the New York Passenger Ship Terminal is within [the Longshoreman's Union's] exclusive jurisdiction." (Brennan Decl., Ex. R).

**B.      Procedural Background**

Petitioners filed a petition to confirm the Default Award on June 21, 2016.  (Dkt. #1).  Pursuant to a June 23, 2016 Scheduling Order (Dkt. #7), Petitioners filed a motion for summary judgment and supporting papers on October 7, 2016 (Dkt. #21-26).  Port Parties cross-moved to vacate the Default Award on October 28, 2016.  (Dkt. #27-34).  Petitioners filed reply papers on November 23, 2016 (Dkt. #35-39), and briefing concluded when Port Parties followed suit on January 6, 2017 (Dkt. #43).

**DISCUSSION**

Petitioners and Port Parties request opposite forms of relief.  Petitioners move to confirm the Default Award and to recover their attorney's fees and costs.  Port Parties moves to vacate the Default Award, arguing that it is the product of Petitioners' fraud, Arbitrator Maher's unfair refusal to adjourn the Arbitration Hearing, and Arbitrator Maher's unwarranted exercise of jurisdiction over work not governed by the CBA.  At the root of Port Parties's

request for vacatur is its belief that it requested, and secured, an adjournment of the Arbitration Hearing.

Port Parties's belief is unfounded. The undisputed facts of this case confirm that Port Parties sought to adjourn and did adjourn its March 2016 arbitration with the *Union*. But those facts are equally clear that this was the only arbitration involving Petitioners that was actually adjourned. And because Port Parties's remaining arguments about the Default Award are unavailing under the LMRA, the Court will confirm the Default Award in full, and award Petitioners fees and costs in an amount to be determined after post-judgment briefing.

**A.   The Court Confirms the Default Award in Its Entirety**

**1.   Applicable Law**

Two principles guide the Court's confirmation of the Default Award. First, "[d]istrict courts should ... treat a[n] ... application to confirm or vacate an arbitral award as akin to a motion for summary judgment." *Salzman* v. *KCD Fin., Inc.*, No. 11 Civ. 5865 (DLC), 2011 WL 6778499, at *2 (S.D.N.Y. Dec. 21, 2011) (quoting *City of N.Y.* v. *Mickalis Pawn Shop, LLC,* 645 F.3d 114, 136 (2d Cir. 2011)). Second, "[e]nforcement of an arbitration award issued under a collective bargaining agreement 'is governed by [S]ection 301 of the LMRA,'" not the Federal Arbitration Act, 9 U.S.C. §§ 1 to 14 (the "FAA") — a rule that both sides missed in their briefs. *Trs. of the N.Y.C. Dist. Council of Carpenters Pension Fund* v. *High Performance Floors Inc.*, No. 15 Civ. 781 (LGS), 2016 WL 3194370, at *2 (S.D.N.Y. June 6, 2016) (quoting *Nat'l Football League*

*Mgmt. Council* v. *Nat'l Football League Players Ass'n*, 820 F.3d 527, 536 (2d Cir. 2016)), *reconsideration denied*, 2016 WL 3911978 (S.D.N.Y. July 15, 2016). The Court addresses each principle in turn.

### a.    Motions for Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Thus, "[a] motion for summary judgment may properly be granted … only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant the entry of judgment for the moving party as a matter of law." *Rogoz* v. *City of Hartford,* 796 F.3d 236, 245 (2d Cir. 2015) (quoting *Kaytor* v. *Elec. Boat Corp.,* 609 F.3d 537, 545 (2d Cir. 2010)).  And where, as here, "parties file cross-motions for summary judgment, … each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Fireman's Fund Ins. Co.* v. *Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (alterations omitted) (internal quotation marks omitted) (quoting *Morales* v. *Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)).

"[A] fact is material if it 'might affect the outcome of the suit under the governing law.'" *Royal Crown Day Care LLC* v. *Dep't of Health & Mental Hygiene of City of N.Y.*, 746 F.3d 538, 544 (2d Cir. 2014) (quoting *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  And "[a] dispute is 'genuine' if

'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Negrete* v. *Citibank, N.A.*, — F. Supp. 3d —, No. 15 Civ. 7250 (RWS), 2017 WL 758516, at *6 (S.D.N.Y. Feb. 27, 2017) (quoting *Liberty Lobby*, 477 U.S. at 248).

"The function of the district court in considering [a] motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz*, 796 F.3d at 245 (quoting *Kaytor*, 609 F.3d at 545). And "[i]n determining whether summary judgment is appropriate, a court must construe the facts in the light most favorable to the non-moving party and … resolve all ambiguities and draw all reasonable inferences against the movant." *Kuhbier* v. *McCartney, Verrino & Rosenberry Vested Producer Plan*, — F. Supp. 3d —, No. 14 Civ. 888 (KMK), 2017 WL 933126, at *7 (S.D.N.Y. Mar. 8, 2017) (internal quotation marks omitted) (quoting *Brod* v. *Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011)).

### b.    The LMRA

Judicial "review of an arbitration award under the LMRA is … 'very limited.'" *Nat'l Football League*, 820 F.3d at 536 (quoting *Major League Baseball Players Ass'n* v. *Garvey*, 532 U.S. 504, 509 (2001) (per curiam)). Courts cannot "review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement." *Id.* And "[u]nless the award is procured through fraud or dishonesty, a reviewing court is bound by the arbitrator's factual findings, interpretation of the contract[,] and suggested remedies." *High Performance*

*Floors*, 2016 WL 3194370, at *2 (quoting *Int'l Bhd. of Elec. Workers* v. *Niagara Mohawk Power Corp.*, 196 F.3d 117, 124 (2d Cir. 1999)).  Under the LMRA, "[i]t is the arbitrator's construction of the contract and assessment of the facts that are dispositive, 'however good, bad, or ugly.'"  *Nat'l Football League*, 820 F.3d at 536 (quoting *Oxford Health Plans LLC* v. *Sutter*, — U.S. —, 133 S. Ct. 2064, 2071 (2013)).  "As long as the award 'draws its essence from the collective bargaining agreement' and is not merely the arbitrator's 'own brand of industrial justice,' it must be confirmed."  *Id.* (internal quotation marks omitted) (quoting *Int'l Bhd. of Elec. Workers, Local 97* v. *Niagara Mohawk Power Corp.*, 143 F.3d 704, 714 (2d Cir. 1998)).

Thus, "[e]ven if [a] [c]ourt is convinced that the arbitrator 'committed serious error,'" a labor arbitration "award should not be vacated so long as the arbitrator is 'even arguably construing or applying the contract and acting within the scope of his authority.'"  *Trs. of N.Y.C. Dist. Council of Carpenters Pension Fund, Welfare Fund, Annuity Fund, Apprenticeship, Journeyman, Retraining, Educ. & Indus. Fund* v. *Mountaintop Cabinet Mfr. Corp.*, No. 11 Civ. 8075 (JMF), 2012 WL 3756279, at *2 (S.D.N.Y. Aug. 29, 2012); *accord Niagara Mohawk*, 196 F.3d at 125 ("[T]he 'contractual theory of arbitration ... requires a reviewing court to affirm an award it views as incorrect — even very incorrect — so long as the decision is plausibly grounded in the parties' agreement.'" (quoting *Wackenhut Corp.* v. *Amalgamated Local 515*, 126 F.3d 29, 32 (2d Cir. 1997))).

Accordingly, the grounds for vacating a labor arbitration award are narrow. "[A] court should vacate an award if it 'contradicts an express and unambiguous term of the contract or … so far departs from the terms of the agreement that it is not even arguably derived from the contract' … in other words, if the award does not 'draw[ ] its essence from the collective bargaining agreement[.]'" *N.Y.C. & Vicinity Dist. Council of United Bhd. of Carpenters & Joiners of Am.* v. *Ass'n of Wall-Ceiling & Carpentry Indus. of N.Y., Inc.*, 826 F.3d 611, 618 (2d Cir. 2016) (quoting *Nat'l Football League*, 820 F.3d at 536; *United Bhd. of Carpenters* v. *Tappan Zee Constructors, LLC*, 804 F.3d 270, 275 (2d Cir. 2015)). A court should also vacate a labor arbitration award "'[i]f the contract as interpreted by [the arbitrator] violates some explicit public policy,' such as 'obedience to judicial orders,'" although this "public policy ground for vacatur is 'extremely limited.'" *Id.* (quoting *W.R. Grace & Co.* v. *Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum & Plastic Workers*, 461 U.S. 757, 766 (1983); *Niagara Mohawk*, 196 F.3d at 125). And "[o]f course, decisions procured by the parties through fraud or through the arbitrator's dishonesty need not be enforced." *United Paperworkers Int'l Union, AFL-CIO* v. *Misco, Inc.*, 484 U.S. 29, 38 (1987).

"Although the FAA does not apply to 'contracts of employment of … workers engaged in foreign or interstate commerce,' … federal courts have often looked to the [FAA] for guidance in labor arbitration cases, especially in the wake of the holding that § 301 of the [LMRA] … empowers the federal courts to fashion rules of federal common law to govern '[s]uits for violation of contracts

between an employer and a labor organization' under the federal labor laws."

*1199/SEIU United Healthcare Workers E.* v. *S. Bronx Mental Health Council Inc.*, No. 13 Civ. 2608 (JGK), 2014 WL 840965, at *6 (S.D.N.Y. Mar. 4, 2014) (quoting 9 U.S.C. § 1; *Misco*, 484 U.S. at 40 n.9).  Section 10 of the FAA provides four grounds for vacating an arbitration award:

> [i] where the award was procured by corruption, fraud, or undue means;
>
> [ii] where there was evident partiality or corruption in the arbitrators, or either of them;
>
> [iii] where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> [iv] where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a)(1)-(4).

## 2. Analysis

Port Parties asserts three arguments for vacating the Default Award — all of which are based in the FAA, and none of which cites the LMRA.[4]  First, Port

---

[4]  In reviewing Port Parties's arguments, the Court observed that many of them could be considered waived, inasmuch as Port Parties failed to appear at the Arbitration Hearing and, *a fortiori,* failed to present them to Arbitrator Maher.  *See Allied Int'l Union* v. *Tristar Patrol Servs., Inc.*, No. 06 Civ. 15515 (LAP), 2007 WL 2845227, at *4 (S.D.N.Y. Sept. 26, 2007) ("[A]ssuming arguendo that Respondent's substantive challenges to the Award have some merit, they were waived by its failure to appear at the hearing. Courts in this District have reached the same conclusion under circumstances similar to those here."); *see id.* (collecting cases). However, because the gravamen of Port Parties's defenses is that it did not knowingly fail to appear, the Court will not focus on waiver arguments, but will instead address Port Parties's claims on their merits.

Parties argues that Petitioners[5] obtained the Default Award by fraud or "undue means" within the meaning of § 10(a)(1) of the FAA. (Resp't Br. 15-18). Second, Port Parties contends that Arbitrator Maher denied Port Parties a fair arbitration hearing in violation of § 10(a)(3). (*Id.* at 18-21). And finally, Port Parties argues that Arbitrator Maher violated § 10(a)(4) when he "exceeded his jurisdiction" in rendering the Default Award. (*Id.* at 21-23). All three arguments lack merit.

### a. Petitioners Did Not Obtain the Default Award by Fraud or Undue Means Within the Meaning of § 10(a)(1)

In support of its first argument for vacatur, Port Parties contends that Petitioners committed three varieties of fraud in obtaining the Default Award. First, Port Parties faults Petitioners for failing to tell Arbitrator Maher that Port Parties had requested an adjournment of the Arbitration Hearing. (Resp't Br. 15). Second, and relatedly, Port Parties argues that Petitioners should have told Arbitrator Maher that Petitioners had consented to Port Parties's adjournment request. (*Id.*). Finally, Port Parties contends that Petitioners failed to inform Arbitrator Maher about the "$138,169.10 of unapplied funds that could offset any award." (*Id.*).

---

[5]  In its brief, Port Parties takes aim at *Petitioners'* alleged misconduct during the Arbitration Hearing. That stance elides the distinction between the Funds and the Union. To be clear, the Arbitration Hearing addressed a dispute between the Funds and Port Parties. And, perhaps unwittingly, Port Parties's error helps explain why it mistakenly believed it had secured a global adjournment of all of its pending arbitrations with the Union and the Funds, when in fact Port Parties only requested an adjournment of its arbitration with the Union. Consistent with the arguments Port Parties makes in its brief, in this Opinion the Court will explain why Petitioners (not just the Funds) did not commit misconduct during the Arbitration Hearing. Nonetheless, the Court recognizes that the Union and the Funds are two distinct sets of entities — and that the Funds, not the Union, initiated the Arbitration Hearing.

Again, Port Parties has not addressed why any of these alleged fraudulent acts would justify vacating the Default Award under the *LMRA*. But even assuming that the FAA governed here, the undisputed facts of this case confirm that Port Parties's first ground for vacating the Default Award fails.

Courts strictly construe Section 10(a)(1) of the FAA. An arbitration "award 'must stand unless it is made *abundantly clear* that it was obtained through corruption, fraud, or undue means.'" *Nat'l Indem. Co.* v. *IRB Brasil Resseguros S.A.*, 164 F. Supp. 3d 457, 484 (S.D.N.Y. 2016) (emphasis added) (internal quotation marks omitted) (quoting *Karppinen* v. *Karl Kiefer Mach. Co.*, 187 F.2d 32, 34 (2d Cir. 1951)), *amended*, 2016 WL 3144057 (S.D.N.Y. Apr. 14, 2016), *aff'd sub nom. Nat'l Indem. Co.* v. *IRB Brasil Reseguros S.A.*, 675 F. App'x 89 (2d Cir. 2017) (summary order). "[T]he Second Circuit has not yet articulated a test for vacating an award on this ground[.]" *Salzman*, 2011 WL 6778499, at *3. "[C]ourts in this [D]istrict," however, "have found that [a] party challenging" an arbitration award under § 10(a)(1) "must show that '[i] [its] adversary engaged in fraudulent activity; [ii] the [party seeking vacatur] could not, in the exercise of due diligence, have discovered the alleged fraud prior to the award; and [iii] the alleged fraud materially related to an issue in the arbitration." *Id.* (quoting *McCarthy* v. *Smith Barney Inc.*, 58 F. Supp. 2d 288, 293 (S.D.N.Y. 1999)).

The first two parts of Port Parties's § 10(a)(1) argument — both of which concern Port Parties's alleged request to adjourn the Arbitration Hearing — can

be dispensed with quickly.  Port Parties's belief that it requested an adjournment of the Arbitration Hearing is chimerical.

To begin, Newman's February 2016 and March 2016 e-mail correspondence with Liang concerned *only* the arbitration between the Union and Port Parties.  Not a single e-mail in that thread mentions the Funds.  To the contrary, in her February 22, 2016 e-mail initiating the thread, Liang — a Union paralegal — explained that she was writing about the Union's scheduled arbitration with Port Parties.  (Union Arbitration E-mails 4).  Newman may have believed that he requested a global adjournment of *every* arbitration involving Port Parties, the Union, and the Funds when he wrote to Liang:  "We need to [postpone] these arbitrations as well as any others until we have time to meet and discuss the open issues — we don't want to default on any of these."  (*Id.* at 2-3).  But it seems that Newman was alone in that belief — and after reading Newman's imprecise e-mail correspondence, the Court can understand why.  At the very least, Liang's ostensible inability to untangle Newman's various requests (only some of which were within her bailiwick) does not bespeak "corruption, fraud, or undue means."

Port Parties also claims that Sherwood's March 22, 2016 e-mail to Virginia constituted a request to adjourn the Arbitration Hearing.  This argument fares even worse.  Sherwood's e-mail was titled:  "arbitration vs. Showtime."  (Brennan Decl., Ex. M, at 1).  The letter attached to that e-mail bore a similar "Re:" line:  "Showtime on the Piers, LLC."  (*Id.* at 3).  And the body of that letter refers to Showtime *seven* times.  (*Id.*).  But neither

Sherwood's e-mail, nor his letter, makes a single mention of Port Parties. (*Id.* at 1, 3). There is only one reasonable reading of Sherwood's March 22, 2016 correspondence with Virginia: Sherwood requested an adjournment of *Showtime's* March 23, 2016 arbitration with the Funds. Nothing in that correspondence suggests that Sherwood made a similar request with regard to Port Parties.

Virginia's conduct supports this conclusion. Two arbitrations took place on the morning of March 23, 2016: The arbitration between the Funds and Showtime was scheduled for 11:00 a.m., followed by the arbitration between the Funds and Port Parties at 11:30 a.m. And during these arbitrations, Virginia, in Arbitrator Maher's presence, called Sherwood (and put him on speakerphone) to ask about Showtime's adjournment request. Those are not the actions of a man attempting to mislead an arbitrator. Quite the contrary: Virginia told Arbitrator Maher about Showtime's adjournment request, then followed up with Sherwood — only to be told by Sherwood that he was not representing Showtime or Port Parties. But Virginia had no reason to make a similar inquiry about Port Parties's arbitration with the Funds, because Port Parties had never requested an adjournment from him.

Port Parties also argues that Petitioners committed fraud by failing to tell Arbitrator Maher that Port Parties did not receive the Notice of Hearing scheduling the Arbitration Hearing. (Resp't Br. 17). Nothing in the record suggests that Port Parties conveyed this fact to the Funds ahead of the Arbitration Hearing. But more importantly, in the Default Award, Arbitrator

Maher found that the Funds "submitted proof that [Port Parties] had legally sufficient notice of [the Arbitration Hearing] and the claims against [Port Parties]." (Default Award 1). That is a factual finding that the LMRA obligates this Court to accept as "dispositive." *Nat'l Football League*, 820 F.3d at 536.

And even if the LMRA did not impose this requirement, the Court is confident that Arbitrator Maher had good reason to conclude that Port Parties had notice of the Arbitration Hearing. Arbitrator Maher sent the Notice of Hearing — via regular and certified mail — to Port Parties's 12th Avenue address, which was listed in the CBA, in the Interim Compliance Agreement, and on the New York Department of State's website. The Funds sent their Notice of Intention to Arbitrate to the same address. Of note, the CBA provides that "[a] post office receipt shall be conclusive evidence of proper service" "of any documents or notice" involving an arbitration "if mailed to the address designated by [Port Parties] when it signed the [CBA]." (CBA Art. XII, § 3).[6] Port Parties's current position — that it never learned of the Arbitration Hearing because it has no authority over the security guard(s) who signed for the Notice of Hearing and Notice of Intention to Arbitrate — holds no weight.

The final element of Port Parties's § 10(a)(1) argument is similarly unavailing. Port Parties contends that Petitioners committed fraud by neglecting to tell Arbitrator Maher about "the $138,169.10 in unapplied

---

[6]     Given the correspondence that Newman did receive, the Court has trouble believing that the notices regarding the Arbitration Hearing were not received. In any event, the CBA also makes clear that "[i]f certified or registered mail is refused or not picked up ordinary mail shall be deemed sufficient service provided that it is forwarded to the address of record contained in this Agreement." (CBA Art. XII, § 3).

funds … which monies could have offset any award entered against Port Parties." (Resp't Br. 17-18). The record sheds dim light on the genesis and nature of this claim, although Petitioners contend that it arises out of "a longstanding dispute between the parties." (Powers Decl. ¶ 15). It is far from "abundantly clear that" Petitioners' failure to raise this issue during the Arbitration Hearing constituted "corruption, fraud, or undue means." *IRB Brasil*, 164 F. Supp. 3d at 484. After all, it would be curious, to say the least, to require a party, on penalty of a later finding of fraud, to advance its adversary's arguments where the adversary fails to appear. But even if this claim had merit — and the Court has no reason to conclude that it does — it overlooks the fact that Arbitrator Maher was presented with the records of the audit, which were introduced to substantiate the Funds' demand and to refute any claims of accounting impropriety. At base, therefore, Port Parties's challenge is a claim that Arbitrator Maher got the facts wrong, which claim this Court cannot consider. *Nat'l Football League*, 820 F.3d at 536.

In sum, Port Parties has not carried its heavy burden of demonstrating that Petitioners violated § 10(a)(1) in obtaining the Default Award.

### b. Arbitrator Maher Did Not Deny Port Parties a Fair Arbitration Hearing in Violation of § 10(a)(3)

Port Parties next takes aim at Arbitrator Maher, arguing that he violated § 10(a)(3) of the FAA by rendering the Default Award in Port Parties's absence. The argument has two parts. First, Port Parties contends that Arbitrator Maher denied Port Parties a fair arbitration hearing when he denied "Port Parties's first adjournment request, which was on consent." (Resp't Br. 18).

And second, by refusing to adjourn the Arbitration Hearing, Arbitrator Maher prevented Port Parties from "present[ing] a defense" at the Arbitration Hearing. (*Id.*). These arguments find no evidentiary support in the record of this case.

Port Parties's § 10(a)(3) argument for vacatur rests on its belief that Arbitrator Maher denied Port Parties a "fundamentally fair hearing." (Resp't Br. 19 (internal quotation mark omitted) (quoting *Smith* v. *Positive Prods.*, 419 F. Supp. 2d 437, 444 (S.D.N.Y. 2005))). The Second Circuit, however, has "never held that the requirement of 'fundamental fairness' applies to arbitration awards under the LMRA." *Nat'l Football League*, 820 F.3d at 545 n.13. In any case, Port Parties's arguments on this score fall flat, because there is no evidence that Port Parties asked Arbitrator Maher to adjourn the Arbitration Hearing.

In the Default Award, Arbitrator Maher concluded that the Funds had made no "request for an adjournment or extension of time to appear" at the Arbitration Hearing. (Default Award 1-2). This Court cannot question that factual finding. *Nat'l Football League*, 820 F.3d at 536. Nor does the Court have reason to do so. Port Parties insists that, "less than one month prior to the hearing, … Port Parties requested an adjournment of all matters that were pending before" Arbitrator Maher. (Resp't Br. 20). The Court assumes that Port Parties bases this claim on Newman's e-mail correspondence with Liang — a *Union* paralegal, who e-mailed Newman about a *Union* arbitration.

Alternately, Port Parties may be alluding to the unanswered voicemail message Newman claims he left for Arbitrator Maher, in which Newman

32

allegedly "request[ed] an adjournment of all pending arbitrations against Port Parties." (Newman Aff. ¶ 41). But Arbitrator Maher does not recall receiving a global adjournment request from Port Parties: Although "[t]here was a request for adjournment as to a Union [a]rbitration," neither Arbitrator Maher nor his office received an adjournment request for the *Funds'* arbitration with Port Parties. (Virginia Decl., Ex. 15, at 1). Newman stands alone in his belief that he asked Arbitrator Maher to adjourn the Arbitration Hearing. No reasonable jury could fault Arbitrator Maher for concluding otherwise.

Port Parties also argues that it "was deprived [of] an opportunity to participate in the [Arbitration Hearing] because it did not receive notice of the hearing." (Resp't Br. 20). As the Court has already explained, this argument is meritless. Arbitrator Maher concluded that the Funds had notice of the Arbitration Hearing, (Default Award 1), and the Court must accept that finding as true. *Nat'l Football League*, 820 F.3d at 536. And even if the Court had authority to question this finding, the undisputed facts of this case confirm that Arbitrator Maher's conclusion was correct. The Default Award and the CBA are clear: Port Parties's claim that it did not have notice of the Arbitration Hearing fails.

Like its first argument for vacating the Default Award, Port Parties's § 10(a)(3) argument directed at Arbitrator Maher lacks merit. Even assuming that the LMRA required Arbitrator Maher to guarantee Port Parties a "fundamentally fair" hearing, nothing in the record suggests that he failed to do so.

### c. Arbitrator Maher Did Not Exceed His Authority in Violation of § 10(a)(4) When He Rendered the Default Award

Finally, Port Parties argues that Arbitrator Maher violated § 10(a)(4) of the FAA by "exceed[ing] his authority and render[ing] his decision on issues that are outside the scope of the" CBA. (Resp't Br. 21). The Default Award, Port Parties claims, awarded Petitioners damages "for work completed at the Piers, which is outside the scope of the" CBA and "which is claimed by the Longshoreman's Union." (*Id.*). And in any case, Port Parties argues, "jurisdictional disputes" (i.e., "disputes over which union is to be assigned [ ] work") are non-arbitrable under the CBA. (*Id.* at 22). For several reasons, Port Parties's § 10(a)(4) argument fails.

"The Second Circuit Court of Appeals has 'consistently accorded the narrowest of readings to the FAA's authorization to vacate awards pursuant to § 10(a)(4).'" *Ecopetrol S.A.* v. *Offshore Expl. & Prod. LLC*, 46 F. Supp. 3d 327, 341 (S.D.N.Y. 2014) (quoting *Banco de Seguros del Estado* v. *Mut. Marine Office, Inc.*, 344 F.3d 255, 262 (2d Cir. 2003)). "[I]n considering a [§ 10(a)(4)] challenge, '[t]he principal question for the reviewing court is whether the arbitrator's award draws its essence' from the agreement to arbitrate, 'since the arbitrator is not free merely to dispense his own brand of industrial justice.'" *ReliaStar Life Ins. Co. of N.Y.* v. *EMC Nat'l Life Co.*, 564 F.3d 81, 85 (2d Cir. 2009) (quoting *187 Concourse Assocs.* v. *Fishman,* 399 F.3d 524, 527 (2d Cir. 2005) (per curiam)). "If the answer to this question is yes, ... the scope of the court's review of the award itself is limited," *id.* at 85-86, and the court may

"not consider whether the arbitrator decided [the challenged] issue correctly,"
*Ecopetrol*, 46 F. Supp. 3d at 341 (internal quotation mark omitted) (quoting
*Thule AB* v. *Advanced Accessory Holding Corp.,* No. 09 Civ. 91 (PKC), 2009 WL
928307, at *2 (S.D.N.Y. Apr. 2, 2009)).

Here, there is no indication that Arbitrator Maher exceeded the authority
that the CBA vested in him. The CBA's arbitration provision is very broad: It
commands Port Parties and the Union to arbitrate "[a]ny grievance" that the
parties are unable to resolve informally. (CBA Art. XII, § 2; *accord id.* at § 3 ("It
is the intent of the parties hereto that all disputes between them, both within
and outside of the [CBA], shall be submitted to arbitration[.]")). The issue
Arbitrator Maher decided in the Default Award — that Port Parties failed to
remit benefit contributions to the Funds — plainly fell within his purview.

Port Parties argues that Arbitrator Maher erred "[b]y finding that benefit
contributions are due to [ ] Petitioners for work performed at the Passenger
Ship Terminal." (Resp't Br. 22). That is because the CBA, Port Parties claims,
"expressly excludes jurisdictional disputes from arbitration." (*Id.*). Port
Parties's reading of the CBA is incorrect. The CBA instructed Port Parties and
the Union to "first attempt to settle and adjust" any disputes arising under the
CBA — "excluding the merits of jurisdictional dispute[s], i.e., a dispute with
another trade over the assignment of work" — before proceeding to arbitration.
(CBA Art. XII, § 1). The CBA added that the parties were required to arbitrate
"all disputes" that they could not settle informally. (*Id.* at §§ 2-3). These
provisions do not conflict. The CBA did not require Port Parties and the Union

to "attempt to settle and adjust" jurisdictional disputes, but it *did* require the parties to arbitrate them.

Port Parties also bases its § 10(a)(4) argument on the October 2016 e-mail and fax from the Longshoreman's Union. In both communications, that union claimed "that carpentry work performed at the New York Passenger Ship Terminal is within [the Longshoreman's Union's] exclusive jurisdiction." (Brennan Decl., Ex. R). The Court is hard-pressed to see how this letter — which the Longshoreman's Union wrote six months *after* Arbitrator Maher issued the Default Award — renders the Default Award infirm. More to the point, nothing in the CBA suggests that work performed at the New York Passenger Ship Terminal was outside of the CBA's scope. The CBA "cover[ed] work performed by [Union] employees" across, *inter alia*, "[a]ll of the five [ ] Boroughs of the City of New York." (CBA Art. VIII, § 1). It made no exception for the New York Passenger Ship Terminal. Port Parties may believe that Arbitrator Maher mistakenly awarded the Funds too much money. But whether Arbitrator Maher's analysis in the Default Award was correct is not an issue this Court can decide under § 10(a)(4). *See Ecopetrol*, 46 F. Supp. 3d at 341 (quoting *Thule AB*, 2009 WL 928307, at *2).

Finally, Port Parties argues that Arbitrator Maher lacked jurisdiction to issue the Default Award, because he "based his authority to act on an agreement that [Port Parties] was not a party to." (Resp't Br. 23). This argument is too clever by half. In the Default Award, Arbitrator Maher wrote that he was deciding a dispute that arose under a March *17*, 2010 agreement

36

between the Union and Port Parties. (Default Award 1). This was an obvious typo: The CBA was "effective as of M[arch] 12, 2010." (CBA 1). Port Parties's suggestion that Arbitrator Maher's clerical error divested him of jurisdiction to issue the Default Award is meritless.

In sum, all of Port Parties's arguments for vacating the Default Award fail. The Court thus confirms the Default Award in its entirety.

## B. The Court Grants Petitioners' Application for Fees and Costs

### 1. Applicable Law

"Generally, 'in a federal action, attorney's fees cannot be recovered by the successful party in the absence of statutory authority for the award.'" *Trs. of the N.Y.C. Dist. Council of Carpenters Pension Fund* v. *Formula 1 Builders, LLC*, No. 17 Civ. 1234 (GHW), 2017 WL 1483369, at *4 (S.D.N.Y. Apr. 25, 2017) (quoting *Int'l Chem. Workers Union, Local No. 227* v. *BASF Wyandotte Corp.*, 774 F.2d 43, 47 (2d Cir. 1985)). And "[§] 301 of the LMRA does not provide for the recovery of attorneys' fees." *Id.* "A court may, however, exercise its inherent equitable powers to award attorney's fees when opposing counsel acts in bad faith." *N.Y.C. Dist. Council of Carpenters* v. *Gen-Cap Indus., Inc.*, No. 11 Civ. 8425 (JMF), 2012 WL 2958265, at *5 (S.D.N.Y. July 20, 2012). "In confirmation proceedings, 'the guiding principle has been stated as follows: [W]hen a challenger refuses to abide by an arbitrator's decision without justification, attorney's fees and costs may properly be awarded.'" *Mountaintop Cabinet*, 2012 WL 3756279, at *4 (quoting *N.Y.C. Dist. Council of Carpenters*

*Pension Fund* v. *Angel Const. Grp., LLC*, No. 08 Civ. 9061 (RJS), 2009 WL
256009, at *2 (S.D.N.Y. Feb. 3, 2009)).

## 2.    Analysis

Arbitrator Maher issued the Default Award on March 24, 2016, over one
year ago.  Port Parties has failed to comply with the Default Award.  And Port
Parties's failure to comply is unjustified:  This Court has considered each of
Port Parties's arguments for vacating the Default Award, and concludes that
each of them fails.  In consequence, Petitioners are entitled to recover the fees
and costs they have expended in litigating this action.

In the "Conclusion" section of this Opinion, the Court will set a schedule
for the parties to brief this issue.  The Court notes here that it intends to award
Petitioners their *reasonable* fees and costs.  Determining whether an attorney's
fee is reasonable requires a court to assess that attorney's hourly rate and the
number of hours he or she billed at that rate.  "A reasonable hourly rate is
'what a reasonable, paying client would be willing to pay.'"  *N.Y.C. & Vicinity
Dist. Council of Carpenters* v. *Plaza Constr. Grp., Inc.*, No. 16 Civ. 1115 (GHW),
2016 WL 3951187, at *2 (S.D.N.Y. July 19, 2016) (quoting *Watkins* v. *Smith*,
No. 12 Civ. 4635 (DLC), 2015 WL 476867, at *3 (S.D.N.Y. Feb. 5, 2015)).  And
"[h]ours that are excessive, redundant, or otherwise unnecessary, are to be
excluded from the calculation of a reasonable fee."  *Id.* (internal quotation
marks and citation omitted).  As for costs, judges in this District "routinely
permit[ ]" attorneys to recoup "filing fees, service of process fees, charges for
delivery of the summons and petition to the process server, and for service of

orders and motion papers on" an opposing party. *Plaza Constr. Grp.*, 2016 WL 3951187, at *2. The Court will expect Petitioners' counsel to be mindful of these principles when preparing Petitioners' application for fees and costs.

**CONCLUSION**

For the reasons set forth above, Petitioners' petition to confirm the Default Award is GRANTED, and Port Parties's cross-petition to vacate the Default Award is DENIED. The Clerk of Court is directed to terminate the motions appearing at Docket Entries 21 and 27.

The parties are ORDERED to submit briefs concerning Petitioners' request for fees and costs pursuant to the following schedule:

- Petitioners' opening brief and supporting materials are due **on or before August 18, 2017**. Petitioners' brief shall be **no longer than 15 pages**.

- Should Port Parties wish to oppose Petitioners' application for fees and costs, its opposition brief and supporting materials are due **on or before September 13, 2017**. Port Parties's opposition brief shall be **no longer than 15 pages**.

- Should Petitioners wish to file a reply brief, that brief is due **on or before September 20, 2017**. Petitioners' reply brief shall be **no longer than 5 pages**.

SO ORDERED.

Dated:      July 31, 2017
          New York, New York

                                              _____
                                               KATHERINE POLK FAILLA
                                        United States District Judge